UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ANTHONY J. SPRINGER,

                Petitioner,

v.

MARY BERGHUIS,

                Respondent.

_____/

Case No. 1:15-cv-808

Honorable Paul L. Maloney

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Anthony J. Springer is incarcerated with the Michigan Department of Corrections at the Lakeland Correctional Facility in Branch County, Michigan.  On February 23, 2010, following a nine-day jury trial and nine days of deliberation in the St. Joseph County Circuit Court,[1] Petitioner was convicted of torture, in violation of Mich. Comp. Laws § 750.85, and first-degree child abuse, in violation of Mich. Comp. Laws § 750.136b(2).  The jury acquitted Petitioner of first-degree and second-degree murder. On April 16, 2010, the court sentenced Petitioner to concurrent prison terms of 25 to 50 years for torture and 10 to 15 years for child abuse.

        Petitioner, with the assistance of appointed counsel, appealed his convictions to the Michigan Court of Appeals, raising five claims:  (1) denial of due process by the admission of a gruesome autopsy photograph; (2) denial of Petitioner's Sixth Amendment right to confrontation

---

[1] The *voir dire*, arguments, all testimony, and the first four days of deliberation took place in the Kalamazoo County Circuit Court building.  The last five days of deliberation took place in St. Joseph County.  The jury was drawn from Kalamazoo County.  The parties attempted to seat a jury from St. Joseph County during October of 2009, but were unable to do so because so many St. Joseph County residents were familiar with the case.  (Jury *Voir Dire* I, Tr. II, ECF No. 23-10.)  For that reason, by stipulation of the parties, the court transferred venue to Kalamazoo County for trial.

because he could not cross-examine his co-defendant who implicated him with out-of-court statements; (3) denial of due process by failure to grant separate trials; (4) denial of Petitioner's Sixth Amendment right to confront and cross-examine Gustavo Pop; and (5) improper departure from the sentencing guidelines.  (Pet'r's Appeal Br., ECF No. 23-35, PageID.4044-4045.)  The court of appeals affirmed the convictions by opinion issued September 13, 2012.  (Mich. Ct. App. Op., ECF No. 23-35, PageID.4030-4041.)

In response to that opinion, Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court, raising the same five grounds.  (Pet'r's Appl. for Leave to Appeal, ECF No. 23-37, PageID.4248-4252.)  The supreme court denied leave to appeal by order entered March 20, 2013.  (Mich. Order, ECF No. 23-37, PageID.4246.)

Petitioner then returned to the trial court.  On January 29, 2014, he filed a *pro per* motion for relief from judgment raising three issues: (1) ineffective assistance of counsel for failure to pursue a defense of entrapment by estoppel; (2) violation of Petitioner's Sixth and Fourteenth Amendment rights because the jurors were permitted to ask questions of witnesses and permitted to engage in predeliberation discussion of the evidence pursuant to a pilot program in the Judge Stutesman's court; and (3) ineffective assistance of counsel for failure to object to the trial court's exclusion of an email message from a witness.  (Pet'r's Mot. for Relief from J., ECF No. 23-30, PageID3683-3685.)  By opinion and order issued July 24, 2014, the trial court denied relief.  (Op. & Order, ECF No. 23-31.)

Petitioner applied for leave to appeal in the Michigan Court of Appeals and then the Michigan Supreme Court.  The court of appeals denied leave by order entered October 27, 2014.  (ECF No. 23-36, PageID.4161.)  Initially, the supreme court denied leave as well.  After the supreme court denied leave, Petitioner filed his habeas petition.  (Pet., ECF No. 1.)  However,

on October 29, 2015, the Michigan Supreme Court vacated its initial denial and, in lieu of granting leave, vacated the trial court's denial of Petitioner's motion with respect to the entrapment by estoppel issue, and remanded the case for a hearing on that matter.  (Order, ECF No. 23-39, PageID.4503.)  The supreme court denied leave to appeal with respect to the other issues.  (*Id*.)

Petitioner sought a stay of proceedings in this Court pending resolution of the entrapment by estoppel issue on remand.  (Mot. to Stay, ECF No. 9.)  The Court granted the stay.  (Order, ECF No. 13.)

The trial court appointed counsel for Petitioner, conducted a hearing on the motion, and invited post-hearing briefs regarding the entrapment by estoppel defense.  On September 8, 2016, the trial court denied Petitioner's motion for relief from judgment.  (ECF No. 23-33.)  Petitioner then filed *pro per* applications for leave to appeal in the Michigan Court of Appeals and the Michigan Supreme Court.  Those courts denied leave by orders entered March 9, 2017, and October 24, 2017, respectively.  (Mich. Ct. App. Order, ECF No. 23-38, PageID.4269; Mich. Order, ECF No. 23-40, PageID.4674.)  Petitioner promptly moved to reopen proceedings in this Court.

Petitioner's timely-filed petition raises five grounds for relief, as follows:

I.      Trial counsel was ineffective for his failure to present the defense of entrapment by estoppel.  Appellate counsel was ineffective for failure to raise the issue on direct appeal concerning trial counsel's ineffectiveness for failure to adequately investigate and present the defense of entrapment by estoppel.

II.     The Michigan Supreme Court violated Petitioner's federal constitutional Fifth and Fourteenth Amendment Due Process rights and Sixth Amendment guarantee to a fair and impartial jury by implementing improper jury experimentation allowing jurors to discuss the case prior to its submission to them, resulting in biased jurors.  Trial counsel was ineffective for failure to object to the constitutional violations and appellate counsel was ineffective for omitting this meritorious issue.

3

III.    Ineffective assistance of appellate counsel for failure to raise obvious trial court violation of appellant's federal constitutional due process right and Sixth Amendment compulsory process to call witnesses and present a defense.  Appellate counsel failed to raise the trial court's violation of Petitioner's due process rights by excluding from evidence an email message from the prosecutor's testifying expert witness.

IV.    Trial counsel was ineffective in failing to more adequately alert the court to the danger of joint trials and in failing to object and otherwise protect his client during the joint trial.  Counsel's incompetence denied Petitioner his constitutional entitlement to a fair trial and impartial jury, and his right to confront co-defendant's statements.

V.    Trial counsel provided ineffective assistance when counsel failed to object to the admission of preliminary examination testimony of Gustavo Pop, in lieu of his presence at trial, thereby denying Petitioner his Sixth Amendment right to confront and cross-examine the witnesses against him.

(Pet., ECF No. 1, PageID.4-15.)

Respondent has filed an answer to the petition (ECF No. 22) stating that the grounds should be denied because they are without merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

## Discussion

### I.    Factual allegations[2]

On February 27, 2008, police and firefighters responded to an emergency call reporting a house fire at Petitioner's home in Centreville, Michigan.  Petitioner's daughter, Calista, died in that fire.  She was chained to her bed and could not escape.

Petitioner and his wife, co-defendant Marsha Springer, restrained Calista to her bed, ostensibly for her own protection.  Calista suffered from pervasive developmental disorder (PDD)

---

[2] The pretrial proceedings, trial, appeals, and post-conviction motions, for Petitioner and his wife, co-defendant Marsha Springer, were handled together.  Petitioner's wife's habeas petition is also before the Court.  *Springer v. Brewer*, 1:17-cv-1080 (W.D. Mich.).  The state court records in both habeas proceedings are substantially identical. There is also substantial overlap in the issues Mr. and Mrs. Springer have raised in their respective habeas petitions. The Court's analysis in resolving the petitions, therefore, is substantially the same in both cases.

4

and had been diagnosed with several other disorders.  Calista required almost constant supervision and, at night, it appears to be undisputed that she needed to be restrained or monitored in some way.  The Springers attempted different methods of restraint; but, just days before the fire, Calista had defeated the bed alarm system they were using.  Pending a "better" solution, the Springers ran a chain, of the type typically used for a dog choke collar, around Calista's waist and then zip tied the chain to the bed frame.

The Springers contended that the chain and zip ties they used were necessary and, indeed, they used them with the knowledge and apparent blessing of the government agencies that were providing assistance or otherwise monitoring the Springers.  That "blessing" purportedly occurred in 2004 when a Department of Human Services (DHS) investigated a claim that Calista's hair had been pulled out.  At that time, Calista told the DHS worker that she was chained to the bed at night.  At trial, Petitioner indicated that Calista was lying then.  He insisted that the chain and zip ties were a recent innovation at the time of the fire.  Mrs. Springer did not testify at trial; however, she testified at the post-conviction motion evidentiary hearing and indicated that the chain and zip tie solution may have been in use during 2004 when DHS was investigating.  It is difficult to reconcile the Springers' different versions of what restraints were used and when they were used.

The defense argued that Petitioner and his wife were loving parents who did the best they could with an impossible situation.  The prosecutor contended that the Mr. and Mrs. Springer's chaining of Calista to her bed was nothing short of torture.

The jurors plainly agonized over deciding the Springers' fate.  They posed several questions during deliberations and suggested to the court several times that they were not likely to reach a verdict.  The jurors even asked the court if they could convict the Springers of a lesser—

but not lesser-included—charge.  Eventually, the jurors acquitted the Springers of first-degree and second-degree murder charges, but found them guilty of torture and child abuse.

## II.    AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court

precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### III.    Ineffective assistance

All of Petitioner's habeas issues include a claim of ineffective assistance from trial counsel, appellate counsel, or both.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the

Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish an ineffective assistance of counsel claim, petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Id.* at 687.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing

on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at

102).

### A.    Entrapment by estoppel (habeas issue I)

Petitioner claims that his trial counsel was ineffective for failing to raise entrapment

by estoppel as a defense to the charges.  The Michigan Court of Appeals described the entrapment

by estoppel defense in *People v. Woods*, 616 N.W.2d 545 (Mich. Ct. App. 2000) as follows:

> Though Michigan appellate courts have not applied the doctrine of entrapment by
> estoppel, the federal courts have applied this defense where a citizen has reasonably
> relied on a government agent's erroneous representation that certain conduct was
> legal, such that prosecution would be unfair under the circumstances.  *Raley v.
> Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959); *United States v. Levin*,
> 973 F.2d 463 (C.A.6, 1992).  We recognize that entrapment by estoppel—which is
> really a variation on the conventional entrapment defense—may, in certain limited
> circumstances, preclude prosecution.  When a citizen reasonably and in good faith
> relies on a government agent's representation that the conduct in question is legal,
> under circumstances where there is nothing to alert a reasonable citizen that the
> agent's statement is erroneous, basic principles of due process should preclude
> prosecution.  However, when a citizen who should know better unreasonably relies
> on the agent's erroneous statement, or when the "statement" is not truly erroneous,
> but just vague or contradictory, the defense is not applicable.

*Woods*, 616 N.W.2d at 548-549.  The *Woods* court articulated several elements of entrapment by

estoppel: "The entrapment by estoppel defense applies where the defendant establishes by a

preponderance of the evidence that (1) a government official (2) told the defendant that certain

criminal conduct was legal, (3) the defendant actually relied on the government official's

statements, (4) and the defendant's reliance was in good faith and reasonable in light of the identity

of the government official, the point of law represented, and the substance of the official's

statement."  *Id*. at 558 (quoting *United States v. West Indies Transport, Inc.*, 127 F.3d 299, 313

(3d Cir. 1997)).  The *Woods* court borrowed a fifth element from a Sixth Circuit statement of the

doctrine: "[and (5)] given the defendant's reliance, the prosecution would be unfair."  *Id*. at 559

(citing *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992)).

The elements of the entrapment by estoppel are not fact questions for the jury; instead, an entrapment by estoppel defense presents questions of law for the trial court to decide. *Woods*, 616 N.W.2d at 554.  The trial court must conduct a separate evidentiary hearing. *Id*.  At the hearing, the defendant bears the burden of proving entrapment by a preponderance of the evidence. *Id*.

Petitioner contends that the circumstances surrounding the resolution of the DHS investigation in 2004 plainly raise the possibility of an entrapment by estoppel defense.  He claims that the DHS worker then—and other workers before and after—were aware of the Springers' attempts to restrain Calista at night and condoned those practices.

Even if defense counsel had not independently considered the possibility of the defense, the trial judge pointed it out at a hearing on August 31, 2009:

> THE COURT:  That's another interesting factor that's not been raised is that this was brought to the State's attention back in 2004, this allegation which has led to a charge of child abuse and torture.  The State investigated it and did not do anything to stop it.  So they were clearly aware of the claim in 2004.  One of the questions I had was whether or not there's an argument that—to be—to be raised in that regard that the State's involvement condoning the use of the chain by not taking any action would raise any argument for the defense in terms of due process rights, but that's not been raised here.

(Mot. Hr'g Tr., ECF No. 23-6, PageID.985-986.)  Petitioner claims that the court's statement should have, but did not, prompt action by his counsel or his wife's counsel.

At the evidentiary hearing on Petitioner's motion for relief from judgment, counsel explained why they did not pursue the defense.  Petitioner's counsel testified that he was never told "that the State condoned what happened.  They knew about it, but [counsel] never was aware of any express recommendation or permission or direction to the Springer family to restrain Calista."  (Evidentiary Hr'g Tr., ECF No. 23-32, PageID.3842.)  Counsel acknowledged that entrapment by estoppel might have been a plausible defense if there were any facts to back it up.

10

(*Id.*, PageID.3845.)  But, counsel said neither he nor Mrs. Springer's counsel ever found any facts they could "hang their hat on" to the effect that someone from DHS affirmatively said that they knew the circumstances under which Calista was being restrained and then said that the Springers should continue the practice.  (*Id.*, PageID.3851.)   Counsel believed that the entrapment by estoppel defense, on the facts before the court, would have been frivolous.  (*Id.*, PageID.3866.)

The viability of the defense was undercut further by Petitioner's testimony.  He insisted that the combination of chain and zip tie to the bed frame had only been used for a few days at the time of the fire and had not been used before.  Accepting as true Mr. Springer's testimony, even if DHS worker Patricia Skelding had approved the 2004 restraints, they would have been different restraints—and according to Petitioner less severe and restrictive restraints— than the chain and zip tie restraint that resulted in Calista's death.

In resolving Petitioner's ineffective assistance claim, the trial court expressly applied the *Strickland* standard.  (Mot. Hr'g Tr., ECF No. 23-32, PageID.3815-3818.)  The trial court applied that standard to the facts mentioned above, concluding that Petitioner had failed to show that his counsel's failure to raise the claim was professionally unreasonable or that the failure prejudiced her:

> [T]he next question is would [the entrapment by estoppel defense] have applied; and I'm ruling that it wouldn't have.  I don't find that sections one, two, or four were done.  The government official never told them that chaining their daughter to a bed with a dog chain and zip ties to the extent where she couldn't lift her body up even a half inch would be legal and would be allowed and there's no reasonable person that could believe that it could be.
>
> When they received word that she was being restrained with dog chains, they went to her home and questioned the parents.  The parents denied that that was the case, invited them to go up and look at the room, denied that they were chaining the child but that they were restraining her.
>
> It is true that they did indicate that she could be restrained-she should be restrained.  They offered different methods of restraint: alarms, belts, door alarms, those types of things.  They never said, yes, go ahead and chain your daughter to the bed to the

point where she can't move, she can't get up if she needs to.  If there's a fire, she can't get away.

The state trooper that broke into the window to try and rescue her was able to grab her body; but, due to her confinement with the chains and the zip ties, he couldn't even lift her off the bed and had to leave the room as the fire was so intense at that point that he could not remove her.

This was well after the family was up.  Mrs. Springer was already doing housekeeping around the home, and the other people were already gone.  So I don't know at what point they planned on ever removing her from that bed, if they did plan to.

But there's no reasonable person to believe that they could restrain their child-no matter how mentally impaired or difficult she was-in that manner, no more than they could change her-cage her in a dog cage, chain her to the basement pillar, or anything else that could have been done and they could rely on the statement that, yes, you can restrain her.

This was not what the government officials told them.  It was four years from the time of the actual offense before the last time a government official had been there, and they denied that there was any dog chains or zip ties being used, even though later it was confirmed, coincidentally, that that was the exact same manner that they found her four years later after they denied that they were doing it.

In addition, Mr. Springer indicated he had only started using that method three days before, so there was no way for the government to have been aware of it and condoned its use and indicated that it was legal.

The use of the word restrain has been muddied here.  The government may have said you can restrain your child in order for her safety.  They provided methods to do so.

[The Springers] then removed their child from school so there was no more complaints from protective services and she wouldn't be bullied by her fellow classmates and she wouldn't have any other issues.

But this use of this method does not meet the requirements of entrapment by estoppel.

In passing, the federal court that reviewed the civil case, the other courts that reviewed the civil case, has all ruled the same, that the government officials did not knowingly allow this behavior to take place and found no liability on their part for this and dismissed all the cases against the DHS and the workers for similar issues.  They found that it was not and is not a valid reason to do it.

For those reasons, I would indicate that, although it may have been ineffective to try, it was not ineffective to bring a fruitless motion that they knew from their

investigation the elements weren't there.  So, for those reasons, I'll deny the motions and indicate that the judgment stand.

And I would have denied the entrapment by estoppel by a preponderance of the evidence, having heard all the testimony at trial and having heard the evidence from the DHS workers, the parties, and the others that there was no evidence to support entrapment by estoppel on the government.

(Decision Tr., ECF No. 23-33, PageID.3978-3981.)[3]

As set forth above, the trial court's determination that Petitioner's trial counsel was not ineffective is entitled to double deference from this Court.  The trial court's determination that the entrapment by estoppel defense was meritless, however, is entitled to more than deference—it is binding on this Court.

It is the prerogative of the state to define the elements of the crime and that definition binds the federal courts.  *See Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements . . . ."); *Jackson*, 443 U.S. at 324 n.16 ("The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses. Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.").  Although Due Process Clause guarantees criminal defendants a meaningful opportunity to present a complete defense, *California v. Trombetta*, 467 U.S. 479, 485 (1984), it is also the prerogative of the state to define whether or not a defense applies to a particular crime.  *See Foucha v. Louisiana*, 504 U.S. 71, 96 (1992) (acknowledging "the general rule that the definition of both crimes and defenses is a matter of state law . . . ."); *Gimotty v. Elo*, 40 F. App'x 29, 32 (6th Cir. 2002) ("States are free to

---

[3] The federal civil case referenced in the trial court's analysis is *Langdon v. Skelding et al.*, 1:10-cv-985 (W.D. Mich.) Calista's grandmother filed a suit under 42 U.S.C. § 1983 against DHS and CPS workers for the harms caused to Calista.  This Court granted the Defendants' motion to dismiss the complaint on September 30, 2011.

define the elements of, and defenses to, crimes. . . . In determining whether a petitioner was entitled to a defense under state law, federal courts must defer to state-court interpretations of the state's laws . . . .").

Petitioner's ineffective assistance claim depends entirely on the viability of the entrapment by estoppel defense. The scope and viability of the defense are state-law issues. Even if the trial court reached the wrong conclusion on that issue, the federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). The trial court's determination that the entrapment by estoppel defense has no merit, therefore, conclusively resolves that issue.

Moreover, in conclusively resolving that state-law issue, the trial court necessarily resolved the ineffective assistance claim as well. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013). Therefore, if the entrapment by estoppel claim is meritless, any claim that counsel failed to raise the defense is necessarily meritless as well.

Petitioner has not shown that the trial court's resolution of this ineffective assistance claim is founded upon factual determinations that are unreasonable on this record. In fact, the trial court's factual determinations are eminently reasonable. Moreover, Petitioner has failed to show that the state court's determinations (1) that his trial counsel was not ineffective for failing to raise the entrapment by estoppel defense and (2) that his appellate counsel was not ineffective for failing to raise trial counsel's failure to raise the entrapment by estoppel defense,

14

are contrary to, or an unreasonable application of clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on these claims.

### B.    Failure to object to juror questions and pre-deliberation juror discussion (habeas issue II)

At the time of Petitioner's trial, the Michigan Supreme Court had adopted a pilot project to study the effects of certain jury reform proposals.  One of the participant judges was St. Joseph County Circuit Court Judge Paul E. Stutesman, Petitioner's trial judge.  The pilot program permitted jurors to pose questions to the witnesses and, when all of the jurors were present during trial breaks, to discuss the evidence even before the close of proofs.  Mich. Admin. Order 2008-2. Judge Stutesman employed both innovations during Petitioner's trial.[4]

Petitioner challenged the constitutionality of both practices in his motion for relief from judgment.  He challenges the constitutionality of the practices in this Court as well. Additionally, he claims his trial counsel and his appellate counsel rendered ineffective assistance because they did not challenge the practices.

Although Petitioner did not challenge the juror questions or the predeliberation discussion on direct appeal, his wife did.  The Michigan Court of Appeals considered, and rejected, both challenges.  With regard to Petitioner's wife's challenge to the practice of permitting the jurors to prepare questions for the witnesses, the court stated:

> Defendants' trial was conducted in accordance with Supreme Court Administrative Order No. 2008-2, which authorized several trial courts to implement a pilot project to study the effects of a jury-reform proposal.  One aspect of AO 2008-2 provided for juror questions:
>
>> The court may permit the jurors to ask questions of witnesses.  If the court permits jurors to ask questions, it must employ a procedure that ensures that such questions are addressed to the witnesses by the court itself, that

---

[4] It is noteworthy that the State of Michigan did not end up adopting all of the innovations.  Although juror predeliberation discussion was eventually adopted, it was adopted only for civil trials.  *Springer v. Brewer*, No. 1:17-cv-1080 (W.D. Mich.) (Mich. June 29, 2011, Order, ECF No. 8-38, PageID.3981-4001.)

inappropriate questions are not asked, and that the parties have an opportunity outside the hearing of the jury to object to the questions. The court shall inform the jurors of the procedures to be followed for submitting questions to witnesses.

In addition, at the time of defendants' trial, MCR 6.414(E) permitted jurors to ask questions of witnesses.

Marsha recognizes our Supreme Court, in *People v Heard*, 388 Mich 182, 187-188; 200 NW2d 73 (1972), permitted trial courts, in their discretion, to allow jurors to ask questions of witnesses. But, relying on *State v Costello*, 646 NW2d 204 (Minn, 2002), where the Minnesota Supreme Court prohibited the practice of allowing jurors to question witnesses in a criminal trial, Marsha asserts that the practice of allowing jurors to submit questions to witnesses should stop. However, we are bound by our Supreme Court's statement in *Heard*, 388 Mich at 187-188, that the questioning of witnesses by jurors is within the sound discretion of the trial court. *See People v Metamora Water Serv, Inc*, 276 Mich App 376, 387-388; 741 NW2d 61 (2007) ("It is the duty of the Supreme Court to overrule or modify caselaw . . . and the Court of Appeals and the lower courts are bound by the precedent established by the Supreme Court until it takes such action."). Because Marsha does not claim that the trial court failed to utilize a  procedure, as required by AO  2008-2, that ensured inappropriate questions would not be asked and because she does not claim that any question submitted by a juror and actually asked was improper, she has not established plain error affecting her substantial rights. *Carines*, 460 Mich at 763. Accordingly, we reject Marsha's claim that the trial court violated her due process right to a fair and impartial jury when it allowed the jurors to submit questions to be asked of witnesses.

(Mich. Ct. App. Op., ECF No. 23-35, PageID.4031) (footnote omitted). With regard to the practice

of permitting predeliberation discussion of the evidence, the court stated:

We acknowledge that the trial court's instruction to the jurors, pursuant to AO 2008-2, that they could discuss the evidence during trial recesses, was contrary to Michigan legal precedent. See *People v Hunter*, 370 Mich 262, 269; 121 NW2d 442 (1963). ("It seems to us clear beyond any doubt that jurors should not be encouraged to discuss evidence they have heard and seen during the course of trial until all of the evidence has been introduced, the arguments to the jury made and the jury charged by the court . . . ."). However, pursuant to AO 2008-2, the trial court was authorized to instruct the jury as it did.

While the trial court instructed the jurors that they could discuss the evidence during trial recesses if they were all present, it also emphasized that such discussions were "to be considered tentative pending final presentation of all evidence, instructions, and arguments," and that the jurors were to keep "an open mind" and not to "decide the case until [they had] heard all the evidence, instructions of law, and arguments of Counsel." The trial court further instructed the jurors that defendants did not

16

have to prove their innocence and that the prosecutor was required to prove the elements of the charged crimes beyond a reasonable doubt.  Marsha claims that because the jurors submitted more than 200 questions to be asked of witnesses during trial, it is "highly likely" that the jurors failed to keep their pre-deliberation discussions tentative.  However, jurors are presumed to follow their instructions, *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), and there is no indication on the record that the jurors failed to heed their instructions. Accordingly, we hold that the trial court's instructions were sufficient to protect Marsha's right to a fair and impartial jury.  There was no plain error affecting Marsha's substantial rights. *Carines*, 460 Mich at 763.

(*Id*., PageID.4032.)

This Court must defer to the Michigan Court of Appeals resolution of Petitioner's constitutional challenges unless the state court's determinations are contrary to, or an unreasonable application of clearly established federal law.  The Sixth Circuit has recognized that "[t]he Supreme Court has not entertained a case involving premature deliberations." *Middlebrook v. Napel*, 698 F.3d 906, 910 (6th Cir. 2012).  Similarly, the Sixth Circuit has concluded that there are no "Supreme Court decision[s] . . . holding that juror questioning violates the Sixth or Fourteenth Amendments." *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006).  For that reason, allowing those practices in Petitioner's case could not be contrary to, or an unreasonable application of, clearly established federal law.

Where the Michigan Supreme Court had adopted a pilot program that included juror questions and permitted predeliberation juror discussion of evidence, where the trial judge had agreed to participate in that pilot program, and where the court of appeals ultimately concluded that those practices were constitutional, Petitioner cannot show that the result would have been any different if counsel had raised the constitutional objections.  If counsel had objected to the constitutionality of the practices, the objection would have been overruled as meritless.  "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley*, 706 F.3d at 752.  Therefore, Petitioner has failed to show that his trial or appellate counsel rendered ineffective

assistance by failing to challenge the constitutionality of juror questions or predeliberation juror discussion of the evidence and he is not entitled to habeas relief on this claim.

### C.    Dr. Kaylor's email and impeachment testimony (habeas issue III)

On September 7, 2000, Dr. Jeffrey Kaylor, a psychologist who evaluated Calista on four occasions in the years preceding the fire, sent an email to Mrs. Springer.  The email included this statement: "Unfortunately, Calista almost needs to be in an institution to provide the amount of supervision she needs to keep her from killing herself by bad judgment."  (Sept. 7, 2000 email, ECF No. 201, PageID.102.)  The trial court refused to admit the document because the defense failed to turn it over during discovery or in response to the court's order to exchange exhibits. (Trial Tr., ECF No. 23-14, PageID.2074.)  The source of the document was Mrs. Springer.  There is no explanation in the record for why the document was not provided during discovery or the exchange of exhibits.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id*. at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id*. at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach

accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

With regard to the exclusion of the email, to bring the issue into the scope of habeas cognizability, Petitioner claims the exclusion violated a principle of justice that is fundamental: the right to present a defense.  Several Supreme Court cases provide support for Petitioner's claim that he must be permitted to present a defense.  In *Crane v. Kentucky*, 476 U.S. 683 (1986), the Court concluded that the United States Constitution guarantees criminal defendants "a meaningful opportunity" to present a complete defense.  *Id*. at 690.  A central component of that guarantee is the right to offer the testimony of witnesses.  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Other components include the right to confront and cross-examine witnesses, *Delaware v. Fensterer*, 474 U.S. 15, 18-20 (1985), and the right to effective assistance from counsel, *Gideon v. Wainwright*, 372 U.S. 335, 343-45 (1963).

In *United States v. Scheffer*, 523 U.S. 303 (1998), the Supreme Court laid out an analytical path for consideration of a claim such as Petitioner's:

> A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.  *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973).  A defendant's interest in presenting such evidence may thus "'bow to accommodate other legitimate interests in the criminal trial process.'"  *Rock, supra*, at 55 (quoting *Chambers, supra*, at 295); *accord, Michigan v. Lucas*, 500 U.S. 145, 149 (1991).  As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve."  *Rock, supra*, at 56; *accord, Lucas, supra*, at 151.  Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.  *See Rock, supra*, at 58; *Chambers, supra*, at 302; *Washington v. Texas*, 388 U.S. 14, 22-23 (1967).

*Scheffer*, 523 U.S. at 308 (footnote omitted).  *Scheffer* involved expert testimony; however, the testimony at issue was that of a polygraph examiner and it was excluded, not as a discovery

sanction, but pursuant to a *per se* rule. *Scheffer*'s facts are easily distinguishable from the facts of Petitioner's case; thus, *Scheffer* cannot serve as the clearly established federal law to which the state court determinations in Petitioner's case are contrary.

The Supreme Court's decision in *Taylor*, 484 U.S. at 400, tracks the facts in Petitioner's case much more closely.  In *Taylor*, the trial court refused to allow a defense witness to testify where the defense failed to timely identify the witness in response to a pretrial discovery request.  *Id*. at 401-02.  The defendant argued that the Sixth Amendment barred a court from ordering the preclusion of defense evidence as a sanction for violating a discovery rule.  *Id*. at 406. He argued, alternatively, that on the specific facts of his case, it was constitutional error to preclude the evidence.  *Id*.

The *Taylor* court reviewed the interests of the prosecutor and the public that limit the right to present witnesses:

> The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case.  The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony. Neither may insist on the right to interrupt the opposing party's case, and obviously there is no absolute right to interrupt the deliberations of the jury to present newly discovered evidence.  The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.

> The defendant's right to compulsory process is itself designed to vindicate the principle that the "ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts."  *United States v. Nixon*, 418 U.S. at 709.  Rules that provide for pretrial discovery of an opponent's witnesses serve the same high purpose.  Discovery, like cross-examination, minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony.  The "State's interest in protecting itself against an eleventh-hour defense" is merely one component of the broader public interest in a full and truthful disclosure of critical facts.

*Taylor*, 484 U.S. at 411-12 (footnotes omitted).  Those countervailing interests require the trial court to exercise its discretion in imposing the proper sanction for failure to disclose a witness in violation of the discovery rules.  *Id.* at 414-15.  The *Taylor* court provided a general framework for the exercise of that discretion:

> [I]t is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case.  It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor.  But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests.  The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

*Id.* at 414-15 (footnote omitted).

Although Petitioner's case is more akin to *Taylor*—where the exclusion was determined to be constitutional—than *Scheffer*—where the exclusion was deemed to be unconstitutional—the state court of appeals' analysis does not really track the analysis in *Scheffer or Taylor*.  Instead, the appellate court noted that "the exclusion of evidence does not result in a constitutional deprivation of the right to present a defense when the defendant is able to present the defense with other evidence."  (Mich. Ct. App. Op., ECF No. 23-35, PageID.4033-4034.)  The court explained how the defense was presented even absent the email:

> Even without the September 7, 2000 email, Marsha was able to present the defense that she restrained Calista in order to prevent Calista from harming herself and others.  Marsha presented several witnesses that testified to the harmful and dangerous behaviors of Calista.  She also presented the testimony of Dr. Carter regarding the common characteristics of children who suffer from PDD and the need for those children to have supervision 24 hours a day.  With this evidence, Marsha argued that she and Anthony restrained Calista as a means of protection.  Accordingly, the exclusion of the September 7, 2000, email did not result in a deprivation of Marsha's right to present a defense.

(*Id.*, PageID.4034.)[5]

Essentially, the court of appeals determined that any error was harmless.  That analytical path is also entirely consistent with clearly established federal law.  Where the evidence comes before the jury some other way, the impact of the exclusion of a particular piece of evidence on the right to present a defense may be harmless.  *Crane*, 476 U.S. at 691; *see also Fleming v. Metrish*, 556 F.3d 520, 536-37 (6th Cir. 2009).

"State courts' harmless-error determinations are adjudications on the merits, and therefore federal courts may grant habeas relief only where those determinations are objectively unreasonable."  *O'Neal v. Balcarcel*, 933 F.3d 618, 624 (6th Cir. 2019) (citing *Davis v. Ayala*, 135 S. Ct. 2187, 2198-99 (2015)).  Although Petitioner insists he lost something when he was denied the opportunity to introduce the email as evidence, he does not show how the court of appeals analysis is unreasonable.  Indeed, the court of appeals could have gone much further.  In addition to the evidence the appellate court identified, Dr. Kaylor's testimony, even without the email, supported the inference that Petitioner attempted to present through the email:  that Calista was a particularly difficult child who needed almost constant monitoring and supervision.

Whether considered in light of *Taylor*—holding that evidence can be properly excluded as a discovery sanction—or *Crane*—noting that exclusion of evidence is harmless if other evidence is admitted to establish the defense—Petitioner has failed to show that the state courts' determination of this claim is contrary to, or an unreasonable application of, clearly established federal law.  Moreover, Petitioner has failed to show that the state courts' factual determinations regarding the evidence admitted is unreasonable on this record.  Accordingly, Petitioner is not entitled to habeas relief on his claim regarding the email.

---

[5] Petitioner did not raise this issue on appeal; his wife did.  Petitioner raised it as part of his motion for relief from judgment.  Thus, the court of appeals' analysis focuses on Mrs. rather than Mr. Springer.

Moreover, the state appellate court's determination of the constitutionality of the exclusion—a determination that is entirely consistent with clearly established federal law—shows that it would have been futile for trial or appellate counsel to challenge the constitutionality of the exclusion.  The challenge would have been rejected as meritless at trial and, in fact, was rejected as meritless on appeal. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley*, 706 F.3d at 752.  Therefore, Petitioner cannot show that his trial counsel's and appellate counsel's failure to raise the arguments constituted ineffective assistance.

In presenting Petitioner's argument regarding the email, he makes passing reference to other evidence excluded by the court related to Dr. Kaylor.  Witness Sharon Roberts had communicated with Dr. Kaylor after the fire.  (Trial Tr. VII, ECF No. 23-18, PageID.3051-3088.)  During that conversation, Dr. Kaylor had referred to Calista as "the child from hell"; referred to Mrs. Springer as a saint; and expressed surprise that Calista was not pregnant.  (*Id.*, PageID.3065.)  The testimony was clearly hearsay; the prosecutor objected.  Defense counsel argued that it was not offered for the truth of the matter asserted, but to impeach Dr. Kaylor who, counsel claimed, had testified that he had not made those statements.

The court concluded the testimony was inadmissible because, contrary to the representations of defense counsel, Dr. Kaylor did not testify that he had not made the statements.  Instead, the doctor testified that he could not remember making the statements.  (Trial Tr. V, ECF No. 23-14, PageID.2138-2139.)  Indeed, Dr. Kaylor acknowledged that he might have made the statements.[6]  (*Id.*)  Under the circumstances, admission of Dr. Kaylor's statements through Ms. Roberts' testimony would not have impeached the doctor at all.

---

[6] Defense counsel did not question Dr. Kaylor regarding the expression of surprise that Calista was not pregnant.  The statements he asked Dr. Kaylor about were describing Calista as a child from hell and Mrs. Springer as a saint.  Only those two statements are at issue.

The Michigan Court of Appeals upheld the trial court's exclusion of Ms. Roberts' testimony regarding Dr. Kaylor's statements:

> MRE 613(b) provides:
>
>> Extrinsic evidence of a prior inconsistent statement is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. The provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).
>
> A determination whether a prior statement by a witness is inconsistent with the witness's testimony is within the trial court's discretion. *People v Graham*, 386 Mich 452, 457; 192 NW2d 255 (1971).
>
> "When a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of that statement." *People v Jenkin*s, 450 Mich 249, 256; 537 NW2d 828 (1995). Dr. Kaylor did not remember his prior statement to the women. However, he acknowledged that he may have told the women that Calista was a child from hell and that Marsha was a saint for caring for Calista. He just did not recall whether he had actually made those statements. Thus, the prior statements of Dr. Kaylor were not inconsistent with his trial testimony. Accordingly, the trial court did not abuse its discretion in determining that Dr. Kaylor's prior statements were not inconsistent with his trial testimony and in precluding Marsha from presenting extrinsic evidence of those statements.

(Mich. Ct. App. Op., ECF No. 23-35, PageID.4034.) As a matter of state law, the trial court's determination that the evidence is inadmissible is binding on this court.

Petitioner does not question the state court's determination of state law; instead, he suggests that the exclusion of this evidence also prevented him from presenting a defense. Petitioner does not explain how the exclusion of this evidence prevented him from presenting a defense. The jury heard several witnesses from whose testimony the jurors could infer that Calista was "the child from hell" or that Mrs. Springer was a saint. As was the case with the email, Petitioner had a sufficient opportunity to present other evidence to make his points. The exclusion of Ms. Roberts' testimony regarding Dr. Kaylor's statements did not deprive him of anything. Therefore, because Petitioner has failed to show that the state court's exclusion of Ms. Roberts'

statements were contrary to, or an unreasonable application of, clearly established federal law, Petitioner is not entitled to habeas relief on this claim.

### D.   Joint trial

Petitioner next contends that his trial counsel rendered ineffective assistance because counsel failed to object to the joint trial of Petitioner and his wife before a single jury. Petitioner identifies two separate reasons separate trials were necessary: first, separate trials are constitutionally required by the Due Process Clause where the prosecution intends to introduce the confession of a co-defendant that incriminates another defendant; and second, separate trials are appropriate where the defenses offered by co-defendants are meaningfully antagonistic.

With regard to Petitioner's first reason, there is no decision of the United States Supreme Court clearly establishing a right under the Due Process Clause to separate trials or juries. Joint trials play a vital role in the criminal justice system. *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). Joint trials generally serve the interests of justice by avoiding inconsistent jury verdicts and facilitating the efficiency and fairness of the criminal justice system. *Id*. at 209–10.

The Supreme Court has delineated few constitutional rules in this area. Petitioner is correct when he argues that the Court has held that separate trials are constitutionally required where the prosecution intends to introduce the confession of a co-defendant which incriminates another defendant. *See Bruton v. United States*, 391 U.S. 123, 137 (1968). The *Bruton* rule is designed to vindicate a defendant's right to confront his accusers, so separate trials are not necessary when the co-defendant is subject to cross-examination.

Beyond the *Bruton* rule, the Supreme Court has left the matter of severance to state law and the trial judge's discretion. The Court remarked in *United States v. Lane*, 474 U.S. 438 (1986), that the denial of a motion for severance does not in and of itself implicate constitutional rights. The Constitution is implicated only when the failure to sever trials is so prejudicial that it

25

imperils a defendant's right to a fair trial.  *Id*. at 446 n. 8.  Consequently, a "petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendants bears a very heavy burden."  *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001).

The Michigan Court of Appeals concluded that the admission of Mrs. Springer's words through other witnesses did not implicate the *Bruton* rule because the "confession" was not a "facially incriminating" one that "powerfully incriminated" Mr. Springer.  (Mich. Ct. App. Op., ECF No. 23-35, PageID.4036-4038.)  Petitioner does not directly attack the reasonableness of the state court's application of *Bruton*; instead, he insists that Mrs. Springer's unconfronted testimony did prejudice him and that such prejudice, under the circumstances present here, is enough to warrant severance and to demonstrate counsel's ineffectiveness for not seeking that relief.

Petitioner relies on *Zafiro v. United States*, 506 U.S. 534 (1993), for the proposition that the denial of a motion to sever is improper and that unfair prejudice results where evidence is admitted against a co-defendant that the defendant's jury should not consider against the defendant and which would not be admissible if the defendant were tried separately.  The Sixth Circuit has concluded that *Zafiro* is based on the Federal Rules of Criminal Procedure, not constitutional grounds.  *See Phillips v. Million*, 374 F.3d 395, 398 (6th Cir. 2004) ("*Zafiro* involved the interpretation of Federal Rules of Criminal Procedure 8, 14, and 18, not the United States Constitution. *Zafiro* thus has no precedential weight in reviewing state court proceedings on due process grounds. . . .").  Therefore, *Zafiro*'s value as precedent in the habeas context is limited.

Petitioner's argument suffers a more fundamental flaw than the limited applicability of *Zafiro*.  The out-of-court statements of Mrs. Springer that were introduced into evidence through the testimony of first-responder Trooper Trevor Slater, Mrs. Springer's half-brother Charles Saddison, and police interviewer Detective Michael Scott, are indistinguishable

from the in-court testimony of Petitioner.  Mrs. Springer's statements describe Calista as a difficult child who required constant monitoring, a child who could not be left to roam at night, and a child who needed to be restrained for her own safety.  Mrs. Springer's statements indicated that the Springers had employed an increasingly restrictive series of restraints as Calista managed to defeat their efforts to protect her.  Mrs. Springer's statements claimed that government agencies knew of, and approved of, the Springers' efforts to protect Calista by restraining her at night.  It is true that Mrs. Springer's out-of-court statements also indicate that Mr. Springer participated in restraining Calista and, therefore, inculpate him; but, after reviewing the entire trial transcript—every reference to an out-of-court statement by Mrs. Springer—the Court cannot identify any statement that is one whit more prejudicial to Petitioner than his own testimony.  To the contrary, where co-defendants typically complain when their defenses are mutually antagonistic, the defenses of Mr. and Mrs. Springer are mutually supporting, each lending credence to the other.

The case closest to Petitioner's situation in the *Bruton* line of cases is *Cruz v. New York*, 481 U.S. 186 (1987).  In *Cruz*, the Supreme Court considered whether a co-defendant's confession could be considered against the defendant where the defendant's own consistent confession was also admitted into evidence.  The *Cruz* court concluded the presence of "interlocking" confessions did not, standing alone, preclude application of the *Bruton* rule, but the *Cruz* court distinguished the situation Petitioner faces here: "[i]t might be otherwise if the defendant were *standing by* his confession, in which case it could be said that the codefendant's confession does no more than support the defendant's very own case."  481 U.S. at 192 (emphasis in original).  Therefore, the state court's determination that the *Bruton* rule does not constitutionally require a separate trial here is neither contrary to, nor an unreasonable application of, clearly established federal law.

27

Moreover, the fact that it augured to Petitioner's benefit for the jury to hear a consistent version of events from Petitioner and his wife and that the jury could only hear that consistent version because it was a joint trial—at least according to Petitioner—reveals that counsel's decision to go forward with a joint trial was professionally reasonable.  The Michigan Court of Appeals reached that conclusion as well:

> To establish that his counsel was ineffective for failing to request some form of severance, Anthony must overcome the presumption that counsel's actions were based on reasonable trial strategy.  *People v. Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007).  Anthony has not overcome this presumption.  Anthony and Marsha presented the same defense: they argued that they loved Calista, who was a special needs child and needed 24–hour supervision, and that any actions they took to restrain Calista's movement were to protect Calista from herself.  Counsel may have reasonably surmised that a joint trial, where Anthony presented the same defense as Marsha, gave him the best opportunity to cast reasonable doubt on whether Anthony had the specific intent to cause Calista serious or extreme mental or physical pain or harm.  In addition, Anthony has not established that defense counsel could have presented the trial court with an offer of proof that clearly, affirmatively, and fully demonstrated that his substantial rights would be prejudiced in a joint trial with Marsha, *Hana*, 447 Mich at 346, such that the trial court would have been mandated to grant a severance.  Counsel is not ineffective for failing to make a futile motion.  *Fike*, 228 Mich App at 182.  Accordingly, counsel's failure to move for severance did not fall below objective standards of reasonableness.

(Mich. Ct. App. Op., ECF No. 23-35, PageID.4038.)  Petitioner has failed to demonstrate that the court of appeals' determination is contrary to, or an unreasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### E.    Confrontation of Gustavo Pop

Finally, Petitioner contends that his trial counsel rendered constitutionally ineffective assistance by failing to object to the presentation of Gustavo Pop's testimony by a DVD of his preliminary examination testimony.  Although the DVD is not part of the record in this Court, the Respondent filed the preliminary examination transcript.  (Prelim. Exam. Tr. I, ECF No. 23-2.)  Fireman Pop's testimony was brief.  (*Id.*, PageID.650-659.)  Most of Pop's testimony was cross-examination by Petitioner's wife's trial counsel.  (*Id.*, PageID.653-659.)  Pop and his partner

attempted to enter Calista's bedroom, climbing a ladder to the second-floor window.  Initially the room was too hot.  They were able to cool it down sufficiently with a hose to enter.  Visibility was limited.  Pop located Calista by feel.  He tried to remove her.  He was able to get his hands underneath her, but could not lift her.  At that time, Pop could not discern why he was unable to lift Calista; but, recognizing that Calista was already dead, she was left in the room for the investigation.

Petitioner contends the admission of Pop's testimony violated his rights under the Confrontation Clause.  The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him."  U.S. Const., Am. VI; *Pointer v. Texas*, 380 U.S. 400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment).  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination.  *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Petitioner raised this issue on direct appeal.  The Michigan Court of Appeals resolved his claim as follows:

> Anthony argues that the admission of the preliminary examination testimony of Gustavo Pop, one of the firemen who responded to the fire, violated his right of confrontation because he never had an adequate opportunity to cross-examine Pop. Defense counsel, however, stipulated to the admission of Pop's preliminary examination testimony.  A "[d]efendant may not assign error on appeal to something that his own counsel deemed proper at trial." *People v Barclay*, 208 Mich App 670, 673; 528 NW2d 842 (1995).  Accordingly, Anthony is precluded from arguing on appeal that the admission of Pop's preliminary examination testimony violated his right of confrontation.

However, Anthony claims that defense counsel was ineffective for stipulating to the admission of Pop's preliminary examination testimony.  The Confrontation Clause bars the admission of testimonial statements of a witness who does not testify at trial unless the witness was unavailable to testify, and the defendant had a prior and adequate opportunity to cross-examine the witness. *Crawford*, 541 US at 57, 68.  Testimonial statements include testimony given at a preliminary examination. *Id.* at 68.  Anthony does not dispute that Pop was unavailable for trial and that he had an opportunity to cross-examine Pop at the preliminary examination.  He claims that because the preliminary examination occurred more than one year before trial and because a different standard of proof is employed at a preliminary examination than at trial, he did not have an adequate opportunity to cross-examine Pop.  The purpose of a preliminary examination is to determine whether a crime has been committed and, if so, whether there is probable cause to believe that the defendant committed the crime. *People v Henderson*, 282 Mich App 307, 312; 765 NW2d 619 (2009).  Admittedly, the standard of proof at a preliminary examination is lower than the standard of proof at trial.  See *id.* However, because the purpose of the preliminary examination was to establish whether there was evidence that Anthony committed the charged offenses, Anthony had an adequate opportunity to confront Pop at the preliminary examination. Accordingly, any objection by defense counsel to the preliminary examination testimony of Pop would have been futile.  Counsel was not ineffective for failing to make a futile objection. *Fike*, 228 Mich App at 182.  Defense counsel's performance in stipulating to the admission of Pop's preliminary examination testimony did not fall below objective standards of reasonableness.

(Mich. Ct. App. Op., ECF No. 23-35, PageID.4038-4039.)

The best explanation of Pop's absence from the trial appears in the prosecutor's opening argument:

Gustavo Pop.  You see it says DVD.  Gustavo Pop is a firefighter for the Centreville Fire Department.  He was the first person inside of the house when the fire was happening.

Unfortunately—He was able to testify at the preliminary examination when we had it.  He's in the military, and he's stationed, I believe, in Texas; so he was not able to come.  Had we brought him back here, the training that he's involved in would have—He would have had to stop and then go back and start it all over again.

So Mr. Bland, Mr. Bush, and I talked about it, and they agreed we're just going to play the DVD of his testimony for you from the preliminary examination.  So just because it's on a DVD doesn't mean that it's not the same evidence as if he were sitting right here today.  It's just—That's why you're going to see a DVD.

30

(Trial Tr. II, ECF No. 23-13, PageID.1728.)  Petitioner does not argue that the admission of Pop's preliminary examination testimony was improper because Pop was not unavailable.  Instead, he focuses on preliminary examination testimony as not offering a sufficient opportunity for cross-examination to overcome the confrontation problem.  The court of appeals disagreed, reasoning that Petitioner "had an adequate opportunity to confront Pop at the preliminary examination." (Mich. Ct. App. Op., ECF No. 8-38, PageID.3716.)  For that reason, the court of appeals concluded that any objection would have been futile.

The Sixth Circuit has noted that there exists "some question whether a preliminary hearing necessarily offers an adequate prior opportunity for cross-examination for Confrontation Clause purposes."  *Al-Timimi v. Jackson*, 379 F. App'x 435, 437-38 (6th Cir. 2010) (citing, *inter alia, Vasquez v. Jones*, 496 F.3d 564, 577 (6th Cir. 2007) (doubting whether "the opportunity to question a witness at a preliminary examination hearing satisfies the pre-Crawford understanding of the Confrontation Clause's guarantee of an opportunity for effective cross-examination") (internal quotation marks omitted)).  But the Supreme Court has never held that a defendant is denied his rights under the Confrontation Clause when a witness is unavailable at trial and the court admits the witness's preliminary examination testimony.  *Id.*, 379 F. App'x at 438. As a result, in the context of a federal court sitting on habeas review, the Sixth Circuit has concluded that a state court's determination that testimony from the preliminary examination was properly admitted was not an unreasonable application of clearly established Supreme Court precedent.  *Id.*, 379 F. App'x at 438-40; *see also Williams v. Bauman*, 759 F.3d 630, 636 (6th Cir. 2014) (citing *Al-Timimi* with approval and upholding on habeas review the admission of testimony from the petitioner's own preliminary examination).

This Court must defer to the state court of appeals' determination that the admission of Pop's preliminary examination testimony did not violate confrontation rights because that determination is not contrary to, or an unreasonable application of, clearly established federal law. That reasonable application of *Crawford*, in turn, has precisely the effect the court of appeals identified: it renders a confrontation objection to the admission of the preliminary examination testimony futile. Counsel's failure to raise a meritless issue does not constitute ineffective assistance. *See Sutton v. Bell*, 645 F.3d 752, 755 (6th Cir. 2011) ("Given the prejudice requirement, 'counsel cannot be ineffective for a failure to raise an issue that lacks merit.'"). Accordingly, Petitioner is not entitled to habeas relief on his final claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, I have examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537

U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, I would not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.  Finally, I recommend that the Court not certify that an appeal would not be taken in good faith.

Dated:  January 31, 2020                    /s/ Ray Kent
                                            United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).